Filed 6/17/24  In re A.V. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re A.V. et al., a Person Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> MARISSA E., <br><br> Defendant and Appellant. | F087372 <br><br> (Super. Ct. Nos. 21CEJ300175-1 & 21CEJ300175-2) <br><br><br> **OPINION** |

## THE COURT*

APPEAL from an order of the Superior Court of Fresno County.  Kimberly J. Nystrom-Geist, Judge.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant

Daniel C. Cederborg, County Counsel, and Ashley N. McGuire, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

\*        Before Detjen, Acting P. J., Franson, J. and Meehan, J.

Appellant Marissa E. (mother) is the mother of six-year-old A.V. and five-year-old H.V. (collectively the children), who are the subjects of this dependency case. Mother challenges the juvenile court's order issued at a Welfare and Institutions Code section 366.26[1] hearing that resulted in her parental rights being terminated. Mother contends the juvenile court erred by failing to apply the beneficial parent-child relationship exception. She also asserts that the juvenile court circumvented the relative placement preference by failing to evaluate the children's maternal great-grandmother for placement. Finding no prejudicial error, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

#### *Initial Removal*

On May 11, 2021, the Fresno County Department of Social Services (department) received a referral alleging mother was smoking marijuana in the presence of law enforcement officers, and law enforcement had taken the children into protective custody. Law enforcement responded to the residence due to a domestic dispute between mother, the children's father, C.V. (father), and father's girlfriend. Father was arrested due to a past warrant for domestic violence from Modesto. Mother was unable to make a plan for the children because she did not have any family in the area.

A social worker responded to the apartment and gathered information from law enforcement prior to speaking with mother. Mother appeared to be under the influence of marijuana, and she had difficulty staying on topic. Mother explained that she was visiting father's apartment in Fresno, but she was currently living with a family in Modesto. The children witnessed the domestic violence incident, and mother admitted to past domestic violence.

---

[1]     All further undesignated statutory references are to the Welfare and Institutions Code.

2.

The maternal grandmother was deceased, and the maternal grandfather molested her as a child. Mother did not have contact with any of her relatives. She denied having a support system, but she stated that she would call her great-grandmother, Maria E., if she needed to. A paternal great-uncle, Todd W., attended the team decision making meeting held on May 12, 2021, and he was advised he could be assessed for placement. The outcome of the meeting was to file a petition on behalf of the children.

The department filed an original petition alleging the children were described by section 300, subdivision (b)(1). The petition alleged the children were at a substantial risk of suffering serious physical harm as a result of mother's substance abuse and domestic violence relationship with father. At the detention hearing held on May 18, 2023, mother was present and appointed counsel. The children were ordered detained, and supervised visitation between the children and mother was ordered to occur twice per week for one hour. A jurisdiction hearing was set for June 9, 2021.

***Jurisdiction and Disposition***

The department's jurisdiction report, dated June 3, 2021, recommended that the allegations in the original petition be found true. The children were placed together in a resource family home, and mother had not provided any information for relatives to be assessed for placement of the children. The juvenile court found the allegations in the original petition true on September 23, 2021, and it set a disposition hearing for October 7, 2021.

The disposition report, dated October 6, 2021, recommended that the children remain in out-of-home care and family reunification services be provided to mother and father. Mother told the social worker that she had been living in a studio on the property of her grandparents' cousin for the past year. The children's paternal grandmother, Stephanie W., was being assessed for placement of the children, but no other relatives were identified as potential options in the report.

Mother was participating in supervised visits with the children in May and June 2021, but she was dropped from the schedule due to excessive absences in July 2021. On June 1, 2021, the children did not appear interested in the visit, and mother seemed to be bothered. Mother requested to end the visit early because she was overwhelmed by the children not paying attention to her. The children's care provider informed the social worker that mother never interfered or tried to redirect the children's behavior during visitation.

At a continued disposition hearing held on November 4, 2021, mother and father were both present and represented by counsel. The paternal grandmother was also present for the hearing, and the juvenile court ordered that placement with the paternal grandmother be denied at that time. The juvenile court found that the children's current placement was appropriate, and it ordered the children to be placed in a resource family home. Mother and father were ordered to participate in family reunification services, and a combined six- and 12-month review hearing was set for April 28, 2022. Mother did not file an appeal from the disposition order.

### Family Reunification Period

On April 11, 2022, mother's counsel filed a section 388 petition requesting that the children be placed in the home of a Muslim, relative, mentor, or person who would respect the parents' Muslim faith. The petition alleged that the children's care providers were Catholic, and the parents did not want the children to be confused. The juvenile court denied the request without a hearing due to the lack of new evidence or a change of circumstances.

The paternal grandmother submitted a letter to the juvenile court on May 19, 2022, which included a copy of her resource family approval certificate. The approval certificate was dated April 11, 2022, and it was a child specific approval for two female children between the ages of two and four. In the letter, the paternal grandmother expressed her desire to take placement of the children.

4.

The department's report for the combined review hearing, dated April 27, 2022, recommended that family reunification services be terminated for mother and father. Mother had lived in several cities since she was released from jail in Florida in late September 2021. In March 2022, mother informed the social worker that she was living with her grandmother in Modesto.

The section of the report entitled "CONSIDERATION OF RELATIVE PLACEMENTS" detailed the status of the children's paternal grandmother, a paternal cousin, and maternal great-grandmother. The department was concerned about placing the children in the paternal grandmother's care because she previously allowed the mother, father, and father's girlfriend to live with her. During that time, a domestic violence incident occurred between the parents. The paternal grandmother also disclosed that father wanted her to take placement of the children so that the parents could "take over." The paternal cousin recently came forward and was provided information on the resource family approval process.

The maternal great-grandmother came forward to request placement of the children on March 29, 2022. The department referred her to the resource family approval unit, and she was advised to begin the process to seek placement. The maternal great-grandmother indicated that she saw the children just before their removal, and she was currently on disability. Mother was living with the maternal great-grandmother at the time of her interview with the social worker on March 29, 2022.

The department was not considering the maternal great-grandmother due to mother using her address as her residence, and there were also concerns surrounding the background clearances for members of her household. The report noted that the maternal great-grandmother contacted the department in August 2021, but she did not request placement because she had a family of seven living in her home at the time. The maternal great-grandmother also believed other family members were going to receive placement.

Mother had not attempted to seek services until March 2022, and the social worker had difficulty referring mother to providers because she regularly moved between Sacramento, San Joaquin, Stanislaus, and Fresno counties. She had not completed any of the components of her case plan at the time of the report. Her incarceration in Florida prevented her from visiting with the children from July to September 2021, but she had consistently attended her visits since her release from incarceration.

Mother's counsel submitted a report of investigation on May 18, 2023. The report, dated August 12, 2022, included a detailed description and photographs of the maternal great-grandmother's home. The investigator stated that the condition of the home was excellent, and it was occupied by mother and the maternal great-grandparents. Mother had moved into the home in February 2022, and the maternal great-grandmother indicated that she was "more than happy" to have mother and the children live in her home for as long as they needed.

After multiple continuances, a contested six- and 12-month review hearing was set for August 16, 2022. Mother filed a second section 388 petition on June 23, 2022, which requested that the juvenile court order the children to be placed in a Muslim resource family home. A hearing on the petition was set on the date of the contested review hearing.

On August 23, 2022, the parties stipulated that a relative living in a building at the back of the maternal great-grandparents home was registered on "Megan's Law."[2] The juvenile court granted several continuances of the contested hearing due to an illness by mother's counsel, mother's hospitalization, a conflict by mother's counsel, and late discovery.

---

[2] The Department of Justice makes information about registered sex offenders available to the public via an Internet website, entitled "Megan's Law." (Pen. Code, §§ 290.4, 290.46; see <http://www.meganslaw.ca.gov> [as of June 17, 2024].)

A combined and contested six-, 12-, 18-, and 24-month review hearing was eventually held on May 18, 2023.  Both parents were present and represented by counsel.  Mother's section 388 petition was denied, and the juvenile court found that the children's current placement was appropriate.  Mother and father's family reunification services were terminated due to their minimal progress, and the parents' visitation with the children was reduced to once per month.  A section 366.26 hearing was set for September 12, 2023.  Mother did not seek an extraordinary writ from the order terminating her reunification services.

***Section 366.26 Hearing***

Mother filed another section 388 petition on September 6, 2023.  The petition requested that the children be returned to mother's custody.  The juvenile court denied the petition without a hearing due to the lack of a showing of a change in circumstances or best interests.

The department's section 366.26 report, dated September 7, 2023, recommended that the juvenile court terminate the parental rights of mother and father and order a permanent plan of adoption for the children.  The children remained placed in the home of the same resource family since May 12, 2021.  A.H., at five years of age, and H.H., at four years of age, each had no noted health concerns, and they were developing on target for their ages.  Both children were receiving mental health services for symptoms of emotional dysregulation.  The children's care providers were committed to providing a permanent plan of adoption for the children.

The report detailed mother and father's attendance at supervised visits throughout the case.  During the reunification period, visitation notes showed that mother would become emotional, but she was playful and interactive with the children.  Mother greeted the children with hugs, shared snacks, and actively spoke to them during her monthly visits in the summer of 2023.  The children referred to their care provider as "mom" during each visit, and there were no signs of distress when mother left the visit.

7.

The social worker acknowledged that mother had consistently participated in supervised visits with the children. However, the social worker concluded that there was no beneficial relationship between the children and mother, and the social worker did not believe the harm of severing the relationship outweighed the security of adoption. The current care providers were observed to meet the children's needs for safety, well-being, and permanency during the social worker's monthly meetings.

A contested section 366.26 hearing was held on October 30, 2023. Mother and father were both present for the hearing. Prior to the hearing, mother's counsel filed a statement of issues that only identified the potential application of an exception to the adoption preference as an issue. Mother testified regarding her visits with the children, and she described how the children hugged her at the beginning of visits. Mother felt there was still a connection between herself and the children, and she believed it would benefit the children to continue her relationship with them.

Counsel for the department and children argued that no exceptions to adoption were applicable. Mother's counsel asked the juvenile court to consider mother's attempts to maintain her relationship with the children, and she submitted on the evidence and witness testimony.

After hearing argument from all counsel, the juvenile court proceeded to its ruling on the beneficial relationship exception by acknowledging that mother visited consistently. The juvenile court highlighted the fact that the children lived with their current care providers for the last two and a half years. It concluded its analysis regarding the existence of a beneficial relationship pursuant to *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*) as follows:

> "So while the Court is fully persuaded by the mother's testimony that she loves and cares for her girls, that she has a strong bond with them, the Court does find that there would be some incidental benefit to continuing a relationship with the mother, the Court does find that the frequent positive contact with the mother as allowed by the Court order is not enough to demonstrate the beneficial

8.

relationship, the substantial, positive, emotional attachment that must be demonstrated under *Caden C.* in this circumstance. So as to both of the parents, they have demonstrated regular visitation and contact, they have demonstrated a relationship.… It is a more significant relationship, but not a substantial positive attachment when it comes to a relationship with the mother for the reasons that were stated." (Italics added.)

The juvenile court continued to the final prong of the exception in the event that mother had established a substantial, positive, emotional attachment. It would not consider several improper factors such as an unfavorable comparison of attributes between the parent and care provider or whether mother was capable of providing a home for the children in reaching its decision. The court concluded by weighing the potential benefits of maintaining the parental relationship against the permanency of adoption as follows:

> "When it comes to balancing the loss of parental rights against the benefit of a new stable home, for [the children], they have been in their care provider's home for so long, that that is their stability. I believe the evidence demonstrates it would not be a new home to them, that it's simply home to them. In weighing the relationship that they have with their parents, assuming that that relationship is, as to the mother, a substantial positive attachment—so assuming that the children have a substantial positive relationship with their mother, the Court finds that there is no evidence that termination of parental rights would be detrimental to them.
>
> Therefore, the Court must conclude that the beneficial parent/child relationship has not been demonstrated as described by statute or based on consideration of the *Caden C.* factors."

The juvenile court proceeded to terminate the parental rights of mother and father and selected a plan of adoption for the children. Mother filed a timely notice of appeal.

## DISCUSSION

### I. Beneficial Parent-Child Relationship Exception

Mother contends the juvenile court erred when it did not apply the beneficial parent-child relationship exception to adoption. Mother argues that mother met her burden to prove all three of the elements of the exception and the court relied on improper factors.

9.

### A.     Legal Principles

At a section 366.26 hearing, when the juvenile court finds by clear and convincing evidence the child is adoptable, it is generally required to terminate parental rights and order the child be placed for adoption unless a statutory exception applies.  (§ 366.26, subd. (c)(1).)  One of the statutory exceptions is the beneficial parent-child relationship exception, which applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" (*id*. subd. (c)(1)(B)) where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (*Id*., subd. (c)(1)(B)(i).)

A parent claiming an exception to adoption has the burden of proof to establish by a preponderance of evidence that the exception applies.  (*In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252.)  Thus, the parent must prove three elements in order to prevail under the beneficial relationship exception:  "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child."  (*Caden C.*, *supra*, 11 Cal.5th at p. 631.)

The first element of the beneficial relationship determination asks the "straightforward" question of whether the parent visited consistently, considering the extent permitted by court orders.  (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)  The focus is on the best interest of the child as opposed to punishing or rewarding parents for good behavior in maintaining contact.  (*Ibid*.)

The second element of the exception asks whether the child would benefit from continuing the relationship.  (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)  The parent-child relationship "may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' "  (*Ibid*., quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.)  The juvenile court's focus

should again be on the child, and it "must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern." (*Caden C.*, at p. 632.)

When considering the third element, courts must determine "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) Potential negative effects from severance of the relationship might include "emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression." (*Ibid*.) An adoptive home might provide a new source of stability that alleviates emotional instability and preoccupation leading to those problems, making the loss "not, at least on balance, detrimental." (*Ibid*.) Under this element, the court is again guided by the child's best interest, but in a "specific way: it decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' " (*Ibid*.)

In *Caden C.*, the appellate court held "that because the parent continued to struggle with substance abuse and mental health issues and because of the risks of foster care and benefits of the potential adoptive home, no reasonable court could find the child's relationship with his parent outweighed the benefits of adoption." (*Caden C.*, *supra*, 11 Cal.5th at pp. 625–626.) Rejecting that conclusion, our Supreme Court found "[t]he Court of Appeal did not explain how the parent's struggles related to the specific elements of the statutory exception: the importance of the child's relationship with the parent or the detriment of losing that relationship." (*Id*. at p. 626.) A parent's struggles with issues that led to dependency were determined to be relevant only to the extent they inform whether the child would "benefit from continuing the relationship and be harmed, on balance, by losing it." (*Id*. at p. 638.)

## B. Standard of Review

Appellate courts review a juvenile court's ruling on the application of the beneficial parent-child relationship exception using a "hybrid" standard. (*Caden C.*,

*supra*, 11 Cal.5th at p. 641.)  The substantial evidence standard applies to the first two elements of regular visitation and existence of a beneficial relationship.  (*Id*. at pp. 639–640.)  The juvenile court's decision as to the third element—whether termination of parental rights would be detrimental to the child—is reviewed for an abuse of discretion.  (*Id*. at p. 640.)  "Review for abuse of discretion is subtly different, focused not primarily on the evidence but the application of a legal standard.  A court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' "  (*Id*. at p. 641.)

The standard of review of a court's determination that a parent did not meet his or her burden to prove an exception to termination of parental rights is "whether the evidence compels a finding in favor of the appellant as a matter of law."  (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)  Specifically, the question is "whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' "  (*In re I.W*., at p. 1528.)

### C.   Analysis

In the present case, the juvenile court determined that mother failed to meet her burden in regards to the beneficial parent-child relationship exception.  While section 366.26, subdivision (c)(1)(D) requires the juvenile court to " 'state its reasons in writing or on the record' " in concluding that termination of parental rights would be detrimental to the child, the court is not required to recite specific findings when it concludes that terminating parental rights would not be detrimental to the child.  (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1156.)  Although a trial court's statement of its findings or an explanation of the reasons for its decision may be helpful in conducting appellate review, it is not a legal requirement.  (*Ibid*.)  Thus, the juvenile court did not err by failing to separately articulate each factor of the exception as mother asserts.

12.

Furthermore, there is nothing in the juvenile court's ruling to show it based its decision on grounds identified in *Caden C.* to be improper. The court concluded its ruling by finding that there were no exceptions to adoption or evidence of detriment to the child if parental rights were terminated. During its ruling, the court expressly stated that it was not comparing mother's attributes to the care providers or considering her ability to provide care for the children. Mother fails to demonstrate how the court injected an improper factor into its determination on the exception. Therefore, we find no such error on this record.

In sum, the evidence in the record weighed in favor of the preferred permanency option of adoption. Given the fact that the children spent the last two and a half years of their young lives in foster care, exhibited no signs of distress when separated from mother at the conclusion of visits, and had developed a significant relationship with their care providers, we find the juvenile court did not abuse its discretion. Under these circumstances, the court's ruling is entitled to a presumption of correctness, and remand is unwarranted. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) Therefore, the juvenile court did not err in declining to apply the beneficial parent-child relationship exception, and its order terminating mother's parental rights was proper.

## II.    Relative Placement Consideration

Mother contends the juvenile court circumvented the relative placement preference considerations of sections 309 and 361.3 by failing to evaluate the maternal great-grandmother for placement. Mother asserts that the case should be remanded with instructions to apply the relative placement preference to the maternal great-grandmother's request because it was applicable when she initially presented herself to the department.

### A.  Forfeiture

"Dependency appeals are governed by section 395, which provides in relevant part: 'A judgment in a proceeding under Section 300 may be appealed from in the same

manner as any final judgment, and any subsequent order may be appealed from as from an order after judgment.' " (*In re Meranda P.* (1997) 56 Cal.App.4th 1143, 1149.) Section 395 makes the dispositional order the appealable " 'judgment.' " Therefore, all subsequent orders are directly appealable, except for orders setting a section 366.26 hearing. (*Meranda P.*, at p. 1150.) Such orders must be challenged by extraordinary writ petition. (Cal. Rules of Court, rule 8.450(a).) If mother believed the department failed to comply with statutory requirements in assessing the maternal great-grandmother, she could have raised the issue at the dispositional hearing and, thereafter, by extraordinary writ petition from the juvenile court's setting order. Since she did not do so, she forfeited her objection. (See *In re A.K.* (2017) 12 Cal.App.5th 492, 500−501.)

### B. Relative Placement Preference

Section 361.3, often referred to as the relative placement preference, provides in relevant part, "In any case in which a child is removed from the physical custody of his or her parents pursuant to Section 361, preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative.…" (§ 361.3, subd. (a).) " 'Preferential consideration' means that the relative seeking placement shall be the first placement to be considered and investigated." (§ 361.3, subd. (c)(1).)

"The statute does 'not supply an evidentiary presumption that placement with a relative is in the child's best interests' but it does require the social services agency and juvenile court to determine whether such a placement is appropriate, taking into account multiple factors including the best interest of the child, the parents' wishes, and the fitness of the relative." (*In re R.T.* (2015) 232 Cal.App.4th 1284, 1295, fn. omitted.) "The correct application of the relative placement preference places the relative 'at the head of the line when the court is determining which placement is in the child's best interests.' " (*Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1033.)

"The relative placement provisions in section 361.3 apply when a child is taken from her parents and placed outside the home pending the determination whether

reunification is possible. [Citation.] The relative placement preference also applies to placements made after the dispositional hearing, even when reunification efforts are no longer ongoing, whenever a child must be moved." (*In re A.K.*, *supra*, 12 Cal.App.5th at p. 498.) The preference, however, does not apply to an adoptive placement, as there is no relative placement preference for adoption. (*Ibid.*; see *In re Lauren R.* (2007) 148 Cal.App.4th 841, 855.) "Instead, at the section 366.26 hearing, the court must apply the caretaker preference under section 366.26, subdivision (k)." (*In re A.K.*, at p. 498.)

Notwithstanding mother's forfeiture, mother fails to demonstrate that the department failed to evaluate the maternal great-grandmother pursuant to the relative placement preference. In support of her argument, mother cites to the case of *In re Isabella G.* (2016) 246 Cal.App.4th 708 (*Isabella G.*). There, the child's grandparents requested placement of the child, but the social services agency ignored their request until after the court terminated reunification services and set a section 366.26 hearing. (*Isabella G.*, at pp. 711−712.) It was not until the grandparents filed a section 388 petition seeking placement that the social services agency completed a relative home assessment and found the grandparents' home suitable for placement. (*Id*. at p. 712.) Nevertheless, the juvenile court denied the petition after it declined to proceed under the relative placement preference set forth in section 361.3 and instead applied the caregiver adoption preference under section 366.26, subdivision (k). (*Isabella G.*, at p. 712.)

The appellate court held that when a relative makes a request for placement of a dependent child before the disposition hearing and the agency does not timely complete a relative home assessment as required by law, the relative requesting placement is entitled to a hearing under section 361.3, even if reunification services have been terminated. (*Isabella*, *G.*, *supra*, Cal.App.4th at p. 712.) The juvenile court rejected the agency's argument that the application of the relative placement factors would not result in a more favorable outcome. (*Id*. at p. 724.) The court cited facts that showed the history and quality of the relationship between the grandmother and the child, including that the

15.

grandmother was the child's primary caregiver from birth until she was nearly two years old, the child missed the grandmother and requested frequent contact with her, and the child wanted to stay with the grandmother. (*Ibid*.) The court concluded that focusing on the child's relationship with grandmother instead of on the quality of the child's relationship with her caregiver might lead to a different outcome on remand. (*Ibid*.)

The case of *Isabella G.* is readily distinguishable given the absence of any request by the mother or maternal great-grandmother to have the juvenile court exercise its independent judgment over the department's decision to reject the maternal great-grandmother for placement consideration. The department and juvenile court did consider the parents' request to place the children with the paternal grandmother during the disposition hearing, but the court denied the request based upon concerns raised by the department. Unlike the grandparents in *Isabella G.* or the paternal grandmother in the present case, the maternal great-grandmother did not attend any hearings in the proceedings.

In fact, she informed the department that she did not request placement of the children prior to the disposition hearing because she had a family of seven living in her home. Thus, she did not invoke the relative placement preference prior to disposition such that section 361.3 was applicable to her late request for consideration. Furthermore, there is no evidence that the maternal great-grandmother maintained a close relationship with the children or took the additional steps to seek resource family approval during the case. Given the limited evidence surrounding the current suitability of the maternal great-grandmother's home, her circumstances do not compare favorably to the grandparents in *Isabella G.*

"When considering whether to place the child with a relative, the juvenile court must apply the placement factors, and any other relevant factors, and exercise its independent judgment concerning the relative's request for placement." (*Isabella G.*, *supra*, 246 Cal.App.4th at p. 719.) Factors to consider in evaluating a placement include,

16.

but aren't limited to, (1) the best interests of the children, (2) the wishes of the parents, (3) proximity of the placement for visitation and reunification with the parents, (4) placement of any siblings and half siblings in the same home, (5) the good moral character of the relative, (6) the nature and duration of the relationship between the child and relative, (7) the relative's ability to provide appropriate and safe care of the child and facilitate visitation with the child's other relatives, and (8) the safety of the home. (§ 361.3, subd. (a)(1)−(8).) "The linchpin of a section 361.3 analysis is whether placement with a relative is in the best interests of the minor." (*Alicia B. v. Superior Court* (2004) 116 Cal.App.4th 856, 862−863.)

The investigative report filed by mother's counsel did establish that the maternal great-grandmother's home was clean and adequately furnished in August 2022. However, it did not alleviate the department's concerns that both mother and a registered sex offender were living on the property. The department informed the maternal great-grandmother that it was not considering her due to mother living in the home, and it also had concerns surrounding the background clearances for members of the home. By the time of the maternal great-grandmother's late request for placement, the children had not seen her for almost a year, and she did not seek to have visits with the children to maintain their relationship.

While the relative placement preference does give priority to relatives who timely request placement, it does not guarantee or create a presumption in favor of such placements. (*Alicia B. v. Superior Court*, *supra*, 116 Cal.App.4th at p. 863.) The focus of the inquiry remains on the best interests of the children, and in this case the record strongly supports a finding that the children were best served by remaining in their longstanding and stable adoptive placement. We have no doubt the children would derive a benefit from cultivating a relationship with their maternal great-grandparents, but "the fundamental duty of the juvenile court is to 'assure the best interest of the child.' " (*Ibid*.) The juvenile court's placement decisions were made in the children's best interests.

Thus, there was no abuse of discretion on this record.  (*Ibid*.; *In re Jessica Z.* (1990) 225 Cal.App.3d 1089, 1100.)

## DISPOSITION

The order is affirmed.